* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. Accordingly, the Full Commission affirms, with some modifications, the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. An employee-employer relationship existed between the named employee and named employer.
3. Attena Insurance Company was the carrier on the risk.
In addition, the parties stipulated into evidence the following:
1. Packet of documents, which included Industrial Commission forms, Employment Security Commission records, a recorded statement and discovery responses.
2. Packet of medical records and reports.
3. Additional medical records submitted February 7, 2007.
The Pre-Trial Agreement dated August 8, 2006, which was submitted by the parties is incorporated by reference.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-three years old and had a ninth grade education. He began working for defendant-employer in October 2002 as an automobile mechanic. His duties included performing state inspections, brake repairs, tune-ups, oil changes and general automotive repair and maintenance. Many tasks required him to work on a vehicle from underneath it, so for those tasks, the vehicle would be raised on a lift. When the vehicle was elevated on a lift, plaintiff would have to reach overhead to perform the work, which also required lifting tools and car parts overhead.
2. During the time in question, plaintiff also operated a garage at his house where he performed mechanical work on cars as a secondary source of income. *Page 3 
3. At the hearing before the Deputy Commissioner, Carl Packard Seto, Jr., the owner of defendant-employer testified that plaintiff was scheduled to work for defendant-employer from 8:00 a.m. to 5:00 p.m., Monday through Friday and certain Saturdays, but he would often arrive late or leave early and would occasionally not report to work at all. Plaintiff thought that he should be allowed flexibility regarding his work hours since he was paid by commission only, and Mr. Seto thought that he should be there as scheduled so that work commitments with customers could be met. This was a matter of ongoing disagreement between plaintiff and Carl Seto, Jr., his supervisor.
4. At the hearing before the Deputy Commissioner, plaintiff testified that he hurt his left shoulder at work on December 6, 2004, when a transmission fell off of a jack and jerked him down. He also testified that Michael LaVelle and Richard Koch immediately came to help him and that he reported the incident to Dana Seto, mother of Carl Seto, Jr. and co-owner of defendant-employer, that day before leaving to see Dr. Owens. Plaintiff also testified that he had experienced no prior problems with his left shoulder until his alleged work injury on December 6, 2004.
5. Contrary to plaintiff's testimony, Mr. Richard Koch testified at the hearing before the Deputy Commissioner that plaintiff never told him he hurt his left shoulder while working for defendant-employer.
6. Dr. Owens was plaintiff's primary care physician. Dr. Owens' medical records submitted into evidence at the hearing before the Deputy Commissioner revealed that on at least two occasions before December 2004, Dr. Owens had treated plaintiff for left shoulder pain. In April 2002 and in April 2004 he injected plaintiff's left shoulder with a cortisone solution. At *Page 4 
the latter office visit, Dr. Owens recorded that there was no history of trauma but that plaintiff worked as a mechanic.
7. Neither Mr. Seto nor his mother, Dana Seto testified that they had knowledge of plaintiff sustaining an injury in December 2004. It was not until plaintiff filed a Form 18, Notice of Accident to Employer, in late 2005 that they learned of an alleged injury.
8. Dr. Owens examined plaintiff on December 6, 2004 for left shoulder pain. His brief note did not mention an injury or trauma. Dr. Owens injected plaintiff's shoulder and referred plaintiff to Dr. Chase, an orthopedic surgeon, for further follow-up treatment.
9. Plaintiff, who had previously seen Dr. Chase for a knee problem, presented to him on December 16, 2004 for his shoulder problem. On that occasion, he told Dr. Chase that he had been having pain for the previous month, that he had had left shoulder problems on and off for two years, that he had not had a specific injury but that he had noticed pain after lifting a heavy object over his head. X-rays performed that day revealed significant arthritic changes as well as calcium deposits at the insertion of the rotator cuff. Dr. Chase injected plaintiff's shoulder and prescribed anti-inflammatory medication for him. At his deposition, Dr. Chase testified that plaintiff told him he was experiencing pain with overhead use and with forward lifting.
10. On January 25, 2005, plaintiff returned to Dr. Chase with no improvement in his symptoms. Consequently, Dr. Chase ordered an MRI. The test revealed no evidence of a tear or significant tendonitis in the rotator cuff, but there was extensive osteoarthritis of the glenohumeral joint and evidence of a labral tear. Dr. Chase injected the glenohumeral joint and discussed surgical options, although he cautioned plaintiff that surgery for an arthritic condition was not as likely to help him as the surgery he had previously undergone on his right shoulder for a different problem. *Page 5 
11. The injection did not provide any relief, so plaintiff elected to undergo surgery on his left shoulder. On March 4, 2005, Dr. Chase performed an arthroscopic procedure in which he confirmed that there was no rotator cuff tear but that plaintiff had extensive arthritic changes where the cartilage was essentially worn out on the glenoid and the humeral head. There was also diffuse fraying of the labrum.
12. According to his testimony at the hearing before the Deputy Commissioner, plaintiff experienced persistent left shoulder pain following the operation. He tried to return to work as a mechanic but found that he could not tolerate the overhead reaching required. Dr. Chase advised him to start looking for a new line of work beginning in May 2005.
13. In June 2005, Dr. Chase referred plaintiff to Dr. Neff, another orthopedic surgeon, for evaluation regarding whether he should undergo shoulder replacement surgery. At his office visits with Dr. Chase, plaintiff requested prescriptions for the narcotic, Percocet, which Dr. Chase provided. There was no evidence to indicate that Dr. Chase was aware that plaintiff had also been receiving prescriptions for Vicodin or Percocet from Dr. Owens during this same time. Dr. Chase last saw plaintiff on July 28, 2005 and at that time learned that plaintiff wanted to pursue workers' compensation benefits. He provided a permanent partial impairment rating at plaintiff's request and advised plaintiff to stop taking narcotics.
14. Due to plaintiff's ongoing pain issues, he was referred to Dr. Nicholas, a physiatrist with Atlantic Rehabilitation Medicine Specialists, for pain management. Dr. Nicholas examined him on July 25, 2005, but despite having been instructed to bring his medications to the appointment, plaintiff did not do so. Dr. Nicholas advised plaintiff that he would not treat plaintiff until he brought in his medications, particularly the narcotics and that the clinic intended to check pharmacy records to determine if plaintiff had been abusing medication. There was no *Page 6 
record of plaintiff returning to Atlantic Rehabilitation Medicine Specialists at any time after that date.
15. On July 5, 2005, Dr. Neff evaluated plaintiff, diagnosed him with end-stage glenohumeral arthritis, and concluded that shoulder replacement surgery would probably give him significant relief. However, Dr. Neff advised him that he probably would not be able to do overhead work if he underwent the operation. Plaintiff ultimately decided to have the surgery, which Dr. Neff performed on December 8, 2005. At the first follow-up visit after the operation, plaintiff reported improvement, but he was subsequently involved in a motor vehicle accident in which he struck his left shoulder against the car door. Following the accident, he reported significant pain, which persisted despite medicine and therapy. His shoulder also became increasingly stiff.
16. On March 9, 2006 Dr. Neff performed an arthroscopic procedure to manipulate the shoulder under anesthesia and to attempt to diagnose any additional problems. He found that the glenoid prosthetic component was quite loose, apparently due to the accident. Consequently, on April 13, 2006, he had to perform another operation to revise the arthroplasty. Dr. Neff then followed plaintiff's recovery until June 9, 2006, at which time plaintiff reported that he was working five days per week in a light duty job.
17. Plaintiff testified that his shoulder had been bothering him on and off for several years. This would be expected with the arthritic changes shown on x-rays. Furthermore, plaintiff had been experiencing left shoulder pain for several weeks prior to the date when he saw Dr. Owens in December 2004. *Page 7 
18. Plaintiff's testimony and that of his stepson, Michael LaVelle, offered at the hearing before the Deputy Commissioner regarding the history of the alleged injury is not accepted as credible.
19. The Full Commission finds that although plaintiff's shoulder may have bothered him at work on December 6, 2004, plaintiff was performing his regular job duties in his normal manner.
20. The greater weight of the competent and credible evidence of record supports a finding that plaintiff did not sustain an injury by accident while performing his duties for defendant-employer on December 6, 2004.
21. Plaintiff did not mention an injury to Carl or Dana Seto at any time before he quit working for defendant-employer in January 2005. The fact that he did not report any injury to his employer until months afterwards impaired defendants' ability to investigate the claim. Plaintiff did not have reasonable excuse for the delay in providing written notice and defendants were prejudiced by it.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order for an injury to be compensable under the Workers' Compensation Act, it must be the result of an "accident." N.C. Gen. Stat. § 97-2(6).
2. An "accident" must involve more than merely carrying on the usual and customary duties in the usual way, but rather involves the interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences. *Page 8 Harding v. Thomas Howard Company, 256 N.C. 427 (1963); see also Davisv. Raleigh Rental Center, 58 N.C. App. 113, 292 S.E.2d 763 (1982).
3. Plaintiff has failed to carry his burden of proving that he was injured as a result of an injury by accident arising out of and in the course of his employment with defendant-employer on December 6, 2004. Having proven no injury by accident, plaintiff is not entitled to workers' compensation benefits for his left shoulder condition. N.C. Gen. Stat. § 97-2(6).
4. Even if plaintiff had sustained a compensable injury at work that day, he failed to give notice of it, either written or verbal, until many months later and defendants were prejudiced by the delay. N.C. Gen. Stat. § 97-22.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiff's claim for workers' compensation benefits must be, and the same is hereby denied.
2. Each side shall pay its own costs.
This the 19th day of October 2007.
S/______________________ PAMELA T. YOUNG CHAIR
CONCURRING:
S/______________________ DIANNE C. SELLERS COMMISSIONER
S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 1